Good morning your honors, Jan Norman on behalf of the petitioner Raymond Robles and I'd like to reserve three minutes of my time. This case involves the question of whether or not the use of undercover agents in questioning or speaking with my client in jail constituted coercion on the part of the police and constituted interrogation calling for a free, calling for a memorandum warning. Isn't the issue more narrow than that? Isn't this a question of whether the California state courts rulings are an unreasonable application of controlling Supreme Court precedent? Certainly your honor, that is certainly the question and the argument is that the California, it's not the California Supreme Court, it's the California Court of Appeal as the last reason opinion. My position is that they unreasonably applied the facts, that they actually had the correct law, but they unreasonably applied the factual, the facts in reaching that determination. So yes, there is a deference to the California Court of Appeal. I mean I will tell you up front, I mean I read the transcript that we have, I will tell you the whole conversation, but there's nothing in the transcript that suggests that your client was intimidated or coerced. It sounds like the, I mean it was a ploy, no doubt trickery was involved, but they just said, hey, we can't help you unless you, unless you tell us, right? And he told them. I just didn't see any place in the transcript where you could, at least unless you're gonna tell me there's something on the tape that's different, but reading the words in the transcript, I didn't see anywhere where they threatened him, said if you don't tell us we are gonna do something to you or something's gonna happen to you. They were there as, hey, we're trying to help you, but you got to tell us in order for us to help you. That was the context, no? Well, I obviously respectfully disagree with the Honor. I think what you have to look at the totality of the circumstances. My client is 20 years old. He's 5'3 and weighs 130 pounds. He's arrested, he's thrown into the Temple City Jail, and suddenly this very large gangbanger shows up with his buddy. Now, I'm gonna refer to him as, with his actual name, which is Beltran, but basically the guy is 6'2. He weighs 225 pounds. He's got a, you know, his head is tattooed all over his body. Now, the conversation they have is, in my interpretation, you've got my client sort of hesitating, scared a little bit, and you've got Beltran coming in and saying to him, pardon me, and I'm gonna leave out the profanity just for the sake of the record, and it's what happened. I couldn't be able to say much then. Well, I know. Yeah, I said, you need to get, you need to get this stuff out and get it off your chest because you're fucked up. Sorry. And then he uses, you know, he refers to African-Americans in a derogatory word, then he goes on again and uses on and on and on as saying that, you know, you're screwed up if you don't talk to me. And Roble's response, very, you know, like, yeah, and then he keeps, and then he's not really saying anything except saying yeah. Then the next comment you get is Beltran saying, you just ain't, you just ain't being real with us, fool. At least with me, fool, you fucking need to get this shit out, dog. You're gonna get homie. What I see that conversation is, you've got my client who then testifies later in the suppression hearing that he was both scared and intimidated. So, I mean, there is evidence that he is interpreting that. And the case law says it has to be, you have to consider what he is perceiving. So, you've got this young, tiny kid with his great big gangbanger who's telling him, you've got to tell me the truth, man. You've got to tell me the truth. Do we just consider the physical stature of your client? I mean, you're focusing on the physical stature of your client, but it seems like we look at the totality. Oh, absolutely, Your Honor. And my argument is that, well, basically district court never looked at the totality of the circumstances and that the things that were left out were his age and size and the fact that he'd never been in jail before. Do you know, did your client, Mr. Robles, ever invoke his Fifth Amendment rights before he was placed in the jail? So, it wasn't clear from the record, but I assume he did not, but did he? Your Honor, I don't know that from the record either. And if that's something that I could certainly submit a supplemental letter if I can find that in the record. Well, it seems like that would be something we would know already, but just curious. So, you were going over the record and you're talking about, you know, kind of the situation there, but I guess, because I've looked over the transcript as well, I've read it. What's the strongest indication that Mr. Robles expressed a reluctance to speak to the undercover officers about the shooting? Can you point to somewhere in that record? Because it seems, I know, and we've heard about the size and everything, but it seems like he readily volunteered information about Cesar Gonzalez after he walked by the cell. And so, if you could point to your strongest part in the record that says that, you know, conveys that he wanted to stay silent and that his will was overborne. Well, I think the answer to that is I cannot point to one specific part where he says, gee, I don't want to talk. That's not what's happening here. What you have is there's some conversation going on, but then you get the questioning from Beltran and you have my client just saying, yeah, yeah, yeah. And then you get, so I think what, and I think the strongest evidence that he's not sufficiently forthcoming is Beltran's comment saying, you aren't being real with us. You have to be real with us. I mean, he is telling my client that he needs to provide additional information. So that they can help him, though. That's the context. It's not, there's not even an implicit threat that if you don't get real with us, we are going to do something to you. Do you have, I mean, that's what I think Judge Murguia was asking. Is there some, what's the strongest comment from Beltran that you can point to where there's even an implied threat that we are going to harm you or you, something else as bad is going to happen to you if you don't tell us what really happened? Well, I don't agree, Your Honor, that he has to basically say, I'm going to beat you up, or there has to be an explicit... But why would he beat him up? Why would Beltran beat him up to help him? It's not a matter of, it's not a matter of whether or not he was going to physically harm my client. The point is that my client is being told, you got to talk to us, you got to talk to us. And he says he's intimidated and scared of them. Then let me ask it maybe this way, because, you know, what's your best case for the proposition that the conduct of Mr. Beltran here and the officers crosses the line from persuasion to coercion? The best argument that I can come up with, Your Honors, is not, is the facts that Beltran is this great big gangbanger who is telling my little client, unexperienced client, that he has to tell him what went on. What, for whatever reason, not even, I don't think you have to say because otherwise I will beat him up. And I think it's important to remember that what Beltran says in his testimony is that, and I'll find it, he says that he used the pejorative word, and I'm going to get there, he used the pejorative word referring to he wanted the appellant to know that I'm a gang member who hates everybody who's not down with my program. Now this little kid, young man, does not want to be hated by this great big gangbanger who's in the cell with him. And at that point I think it's overcome, he's intimidated, he's scared, he wants to do what this great big guy is telling him to do. Even if it may help him, he's afraid, he's reticent to say anything, and he's reticent or unwilling to not do what this guy is telling me he has to do. And I think I've run out of my time. I'll give you a minute for questions. Good morning, your honors. May it please the court. Deputy Attorney General Stacy Schwartz on behalf of Respondent. The California Court of Appeal reasonably concluded that petitioner statements to the officers were voluntary. In looking at the totality of the circumstances, the detectives never threatened petitioner and he made the statements to them because he thought that they were going to help him. But doesn't the totality of circumstances shouldn't it include the physical aspects and characteristics of your client and of the detective here, Robles, because it doesn't look like that was considered, or at least it wasn't spoken to, by the California Court of Appeals. And I know that that may not be the primary point, but it seems like an important consideration considering the disparity here and the No, your honor. First of all, the courts, both courts, the Court of Appeal and the District Court, did consider Detective Beltran's considerable size. But they didn't consider his, Mr. Robles. Well, it sort of implied that in describing how big he was, it sort of implied that petitioner was necessarily smaller. I mean, I would argue most people are probably smaller than Detective Beltran. But we have to remember also, petitioner's counsel would have you think you had this poor kid thrown into a holding cell who was accused of jaywalking and now is suddenly confessing to some horrible crime. He was 22 years old. He wasn't a minor. And while he was small in stature, he was walking around carrying a loaded nine millimeter gun with hollow point bullets and killed someone who was also larger than him. So I think while the size is obviously a consideration for courts to take into account, one that was taken into account here, and I don't think Detective Beltran's size can necessarily be deemed impermissible police coercion or impermissible police activity. So you say he was charged with murder or arrested for murder? Yes, your honor. So was he read his rights before he was put in the cell? Let me say this. He was brought in for murder. He had not yet been charged. So he had not yet been read his rights. And that was the issue that was raised in the trial court, which was this had started out strictly as a Miranda issue. My client wasn't advised of his rights. You should have read him his rights, one, and he should have been given counsel. And the counsel part was disposed of easily because he had not yet been charged and trial counsel agreed to that. So then the focus was you never read my client his rights. And so that was really the focus throughout the trial court. So he had not yet been read his rights. There's a couple of things I would like to... Do I have this right? Doesn't he, after this jailhouse confession, speak to law enforcement and give a different story? After his jailhouse conversation with the detectives, he then has a formal interview with the detectives where he is... Where he's Mirandized? Absolutely, your honor. Okay. He has read his rights. He gives his formal interview and he adopts this plan that's given to him or that is discussed with Detective Beltran where he says, yes, I was at the scene of this fight, but I didn't have anything to do with the shooting. In clearing up some of the statements made, petitioner did not say that he was, quote, scared and intimidated. And that's why he made the statement. He says, I was a little scared. I was a little intimidated, but I thought these guys were there to help me. He later says, when confronted with some discrepancies in his testimony, when he takes a stand, he says, yeah, I may have embellished a little bit because I'm trying to impress my cellmates. And the due process clause is not there to protect someone against boastful activity or misplaced trust in somebody. Also, the detectives did not pounce upon petitioner as petitioner would have you believe. In fact, these statements that are now challenged don't occur until page nine of the transcript. Clearly, the court has read the transcript and it's clear they're joking about somebody eating somebody's lunch. There's drinks that aren't being delivered. They're talking about people using the restroom, people being passed out. And they're sort of having this very, you know, cordial. Can I ask, I'm glad that you started to wade into that territory because you've listened to the tape, I assume? I haven't, Your Honor. I've read the transcript. You have not listened to the tape? I have not listened to the tape. Really? Why would you not listen to the tape? I asked myself that question last night, Your Honor. You know, it was not, the transcript was complete enough. The court of appeal considered this on the transcript. The district court considered on the transcript. And the transcript is very clear. This isn't a situation. But you know, you know, from your experience, that things can look on a transcript one way and when you actually hear the tone, the sort of, you know, the other sort of intangible things that come with human interaction, it can be very different when you actually hear it on tape. And so I guess... That's true, Your Honor. But Petitioner took the stand and never testified that any of these things happened. He had an opportunity when he was on the stand to say, I know that it says this, because the jury had already heard the transcript. I'm actually not trying to criticize you in terms of our ability to decide the case. I agree with you, the transcript is helpful. I'm just more saying in terms of preparing adequately for oral argument, it just seems like I would have listened to the tape, at least done that, right? It's true, Your Honor. The court of, there's no indication the court of appeal looked at it. There's no indication the district court looked at it. They looked at the transcript and the transcript is sufficient in order to make an argument. It does seem though, I mean, even just reading the transcript, that the undercover officer's language was rather forceful. Would you agree with that? Forceful? I would call it authentic. He's there as this experienced gangbanger and he's using the language of an experienced gangbanger. I think it would have been suspect if he had used proper English, had never uttered the F word or used any of these words. He's in there, he's a very experienced detective. In addition to portraying himself as this experienced criminal, he's an experienced detective. He testified, he had done I think between 40 and 60 undercover operations and he knows how to act and I think it would have been suspect. 40 undercover operations, is this like a national thing? Does he fly in and drop into these jail cells and do this with regularity? He was with the Sheriff's Department and he's probably loaned out to different, I think that's what he testified to, is that he's loaned out to different agencies because he has this unconventional look and he plays this role very well and given his upbringing, he testified that he's familiar with how to speak and he's able to present himself as this OG experienced gang member. But authentic can still be forceful. True, Your Honor, but not necessarily intimidating and not necessarily impermissible and not necessarily coercive. No, right, and so I mean again, like as I mentioned earlier, we have to find the line between persuasive and coercive and it does seem at some point, I don't know if it's here, but at some point this type of tactic can cross the line. It can. It didn't in this situation. But it seems risky. You know, I can understand the court's reluctance with something such as this undercover operation. In fact, the trial court at the ruling, after there was the suppression issue, the tape is brought in, then there's a motion for a new trial. And the trial court even said, listen, I kind of have a problem with this. This kind of rubs me the wrong way. But listen, this is the way I have to rule and this is the state of the law. And I can understand if the court has some reluctance about permitting this sort of allowing. It's just when it gets to us, we have to decide whether it did cross the line. And it just seems rather risky. It is risky. And in this situation, the police did not cross the line. There was no coercive activity. And for that reason, the Court of Appeals decision on this matter was reasonable. Looking at the issue of prejudice, as noted by the California Court of Appeals, this confession was not even the most compelling evidence of petitioner's guilt. The evidence pointed to one gun and one shooter. Three different eyewitnesses, including a friend of petitioner's. Well, that's an excellent point that you raised. I meant to ask you about that, because you knew about that before, didn't you? Why use the statement? Well, listen, the statement is helpful. The prosecutor is going to use every means that order to... Eyewitnesses that placed them there, right? Absolutely. And in looking at the tape, even defense counsel admitted there were some things in there that were helpful to his client. I would venture to say perhaps defense counsel would have even introduced portions of the tape because it went to his defense. His defense was that I was shooting to prevent this horrific beating that was happening to my friend. And so his argument was that it was a justifiable homicide. He was also arguing that he was, quote, intoxicated in the tape. He talks about being faded and that corroborated his version of events that he didn't have the intent to kill and that he committed this homicide in a justifiable attempt to protect his friend. So it did help him, not hurt him in many ways. Thank you. Thank you. Two quick points. I didn't have the opportunity or I didn't take the opportunity to address the harmless air analysis in my briefing because it was not considered by the district court. I would say very briefly that it's clear that the tape was harmful in undermining my client's self-defense defense. If the court would like to hear briefing on the harmless air analysis, I would ask to be given the opportunity to do so. The second point I'd like to make is that interrogation includes words or action on part of the police that police should know are reasonably likely to elicit an incriminating response. And you focus on the perceptions of the suspect. And my question is, if the demeanor, the size, and the comments by the undercover agent Beltran were not designed to do exactly that, to elicit incriminating, why did the police have to use someone like Mr. Beltran? They could have put another gangbanger in there that wasn't some great, big, huge, 125-pound, 6'2", older guy. I think that the whole use of someone like Beltran was to intimidate and get the subjects to confess. And I think that's what happened in this case. Thank you. Thank you. Thank you both for your arguments here today. The case of Raymond Robles versus Valenzuela is now submitted.
judges: Murguia, Watford, Vanaskie